## In re: Petition of Village of Cabot

[270 A.2d 158]

No. 23-69

Present: Holden, C.J., Shangraw, Barney, Smith and Keyser, JJ.

Opinion Filed October 6, 1970

*A. Pearley Feen,* and *Paul D. Sheehey,* Burlington, for Green Mountain Power Corporation, Appellee.

*Paterson, Gibson, Noble & Brownell,* Montpelier, for Village of Cabot.

*Frederick J. Fayette,* Burlington, for Washington Electric Cooperative, Inc., Appellant.

**Keyser, J.** The Village of Cabot owns and operates a public water system for the benefit of its residents. A second well, drilled to provide a more adequate supply of water, required electric service for its pumping facilities. A dispute arose as to whether Green Mountain Power Corporation (GMP) or

Washington Electric Cooperative, Inc. (WEC) was entitled to deliver the electric energy at the well site.

As a consequence, the Village of Cabot brought a petition to the Public Service Board (Board) in which both power companies were made parties and prayed that GMP be ordered to provide the electric service. After hearing and findings of fact, the Board found in favor of GMP and ordered that it was entitled to provide the electric service to the well site. WEC appealed from the decision of the Board.

WEC claims that on the facts found by the Board its service line was closer to the point of service than GMP's line and that this fact entitles it to supply the required electric energy to the village under the provisions of 30 V.S.A. § 2809. This statute, together with 30 V.S.A. § 2808, expresses the general rules relating to the territorial distribution of electric energy in accordance with the policy declared in 30 V.S.A. § 2807 which reads as follows:

"It is hereby declared to be the policy of the state that the public interest requires that the public be protected from overlapping conditions which would lead to unnecessary duplication of service and economical waste in the distribution of electric energy."

Section 2808 prohibits a public utility from constructing a line to provide service where it is presently provided by another utility.

Section 2809 expresses the rule where service does not exist and reads:

"A public utility shall not extend any new electric service line to a person or property not presently served unless its existing service facilities are nearer the metering point on said premises to be served than the service line of any other public utility, . . . ."

Identical exceptions appear in sections 2808 and 2809 but these have no application here.

The following facts appear in the findings made by the Board.

The new (second) well is located inside the village near the Danville Hill Road and requires electric power to operate a three-phase pump. Power to the older well used by the village

is supplied by GMP to operate such a pump. Both GMP and WEC propose to use a Scott connection at the new well which will provide the three-phase pump. Neither power company proposes to supply conventional three-phase current at the well site.

The village made application to GMP for electric service at the new well site on July 1, 1968. At that time the closest existing service facility of GMP was 1,805 feet away and that of WEC was 1,345 feet at the Bothfield residence. On July 5, 1968, GMP declined the application of the village on the ground that the existing service facilities of WEC were closer than its own facilities.

The chairman of the village water commission, Harold M. Gibson, who made the application to GMP, then consulted with his grandfather and his mother who owned the so-called Walbridge sugarhouse. This consultation was in regard to their making an application for service at the sugarhouse by GMP. The purpose of having power at that location was to operate an electric heater for a crawler tractor used in sugaring. An application to GMP by Mr. Gibson's mother for such service followed on July 22, 1968. Mr. Gibson admitted that the timing of the application was affected by the need for electric service at the new well.

On August 12, 1968, GMP contracted with Mr. Gibson's mother to supply electricity to the sugarhouse with the requirement that the service be taken for a five-year period. On August 23, 1968, the village applied to GMP a second time for electric service at the new well. On September 9, 1968, GMP completed its extension of a service line to the Walbridge sugarhouse and nine days later the village filed its petition with the Board. On August 22, 1968, WEC completed an extension of a service line to the site of the new well from the Bothfield property. This was done in anticipation of providing the service although the village had made no application to WEC to supply the power. It was not until August 26, 1968, that WEC learned of the projected line extension by GMP to the Walbridge sugarhouse.

GMP contends that the village should be regarded as "a person or property presently served" by it since it supplies power to the village at its first well site and that this precludes an extension of its service line to the well site by WEC. The

fact is that the property (well site) is "not presently served" and the provisions of section 2809 apply, not section 2808. To interpret the statutes as GMP claims could well lead to absurd situations and would be contrary to the avowed policy expressed by the legislature in section 2807. Furthermore, the prohibition against extending a new electric service line is qualified by the statute which cannot be disregarded. The Board held that the contention was unsound and unsupported by any authority called to its attention. The ruling "that the site of the new well is not presently served by GMP for the purpose of section 2808" is without error.

This leads us to the question of the legislative intent and meaning of "existing service facilities" as used in section 2809. This involves a determination of the date on which the service facilities existed and the *bona fide* nature of such facilities.

The Board ruled that the date on which service facilities existed is to be determined as of the hearing date, October 21, 1968. WEC contends, to the contrary, that the time is fixed by the date when the need for power is established. This need, it argues, arose on July 1, 1968, when the village made application to GMP for service.

 The concern of courts in considering statutory meaning is directed at determining the corrective action the legislature sought to accomplish by the enactment. This is legislative intent and is our sole concern. *Amer. Oil Co.* v. *State Highway Board,* 122 Vt. 496, 498, 177 A.2d 358. Among other things, rules of construction of statutes call for a determination of the intent of the legislature by weighing the consequences of various constructions, beginning with the most liberal, against the general objectives of the enactment. *Marshall* v. *Brattleboro,* 121 Vt. 417, 419, 160 A.2d 762.

At the time the petition was heard, GMP had completed construction to the Walbridge sugarhouse. This was seventy-one days from the time the village first applied for electric service to GMP and was refused. After the sugarhouse extension was built, the distance from that point to the well site was reduced to 871 feet, or more than 900 feet over what it was on July 1, 1968. Even on August 23, 1968, the date of the second application by the village to GMP, the extension to be

built was only under contract made eleven days before between Gibson's mother, Mrs. Bean, and GMP.

■ The village first asked for electric service on July 1 and again on August 23 at which times the service facilities of WEC were closer to the new well site than GMP's lines. The holding of the Board demonstrates what can happen if the time service facilities existed is fixed as the date of hearing. Here, the lapse of time between July 1 and August 21 aided GMP so that with the help of Mr. Gibson it could get into a more favorable position and bring its facilities "nearer the metering point of the premises" than WEC's at the time of hearing. Delays before a petition for service is brought, together with delays afterwards for one reason or another before a hearing is had, leave the road open to unfair and inequitable practices and subversion of the sections 2807–2809.

When the call for electric service was made by the village to GMP on July 1, GMP recognized that it was not qualified to furnish it as against WEC. The right of WEC to provide the service came into existence and was established at that time. An interpretation of section 2809 which determines the date in question as the date of the hearing by the Board defeats and circumvents the clear legislative policy and intent enunciated in sections 2807 and 2809. The interpretation of the Board given the statutes in point here was error.

On the undisputed facts in the case we hold that only WEC has the right to furnish the electric service to the new well site of the petitioner.

In view of our holding it is unnecessary to consider the remaining question of the *bona fide* character of the Walbridge sugarhouse facility constructed by GMP but not completed until September 9, 1968.

*Exceptions sustained, the order of the Public Service Board is vacated and set aside; the cause is remanded for entry of a new order consistent with the views herein expressed. Let the result be certified to the Public Service Board.*